UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LM GENERAL INSURANCE COMPANY, AMERICAN STATES INSURANCE COMPANY, WAUSAU UNDERWRITERS INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY MUTUAL PERSONAL INSURANCE COMPANY, AND LM INSURANCE CORPORATION, | C.A. No.: |
| Plaintiffs | |
| vs. | |
| ARGYLE PHARMACY INC, MEHTAB BIBI, AND TIMUR YUZEFPOLSKY, | |
| Defendants. | |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, LM General Insurance Company, American States Insurance Company, Wausau Underwriters Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Mutual Personal Insurance Company, and LM Insurance Corporation (collectively, "Liberty Mutual" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

I.    **INTRODUCTION**

1.    Defendants Mehtab Bibi ("Bibi") and Timur Yuzefpolsky ("Yuzefpolsky") devised and implemented a fraudulent scheme to unlawfully operate Argyle Pharmacy Inc ("Argyle") in violation of New York Law.

1

2.      The Defendants[1] damaged Liberty Mutual by submitting fraudulent claims through Argyle seeking payment for pain-relief products, including Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, Cyclobenzaprine, Naproxen, and Baclofen ("Pain Products").

3.      The Defendants submitted the claims to Liberty Mutual under New York's No-Fault laws, which provide insurance coverage to persons ("claimants") involved in automobile accidents.

4.      New York was an ideal venue for this scheme because claimants are eligible for at least $50,000.00 in coverage for necessary medical and pharmacy expenses, and because claimants can assign their No-Fault benefits to pharmacies.

5.      Pharmacies can seek payment directly from the claimant's insurer, which removes claimants from the billing process and keeps them ignorant about the cost of their care.

6.      Pharmacies are not eligible to collect No-Fault payments if they fail to comply with applicable New York state licensing laws.

7.      Pharmacies are prohibited from billing for unnecessary drugs under New York's No-Fault laws.

8.      Here, the Defendants billed Liberty Mutual for Pain Products that were medically unnecessary—the claimants did not need the Pain Products, and the drugs were ineffective to treat musculoskeletal conditions.

9.      The Pain Products were ordered for claimants as part of a fraudulent pre-determined treatment protocol that required prescriptions for all claimants regardless of medical need.

10.     The Defendants knew that the Pain Products billed to Liberty Mutual by Argyle were medically unnecessary and ineffective.

---

[1] The term "Defendants" means Argyle, Bibi and Yuzefpolsky.

11.     Pharmacies must also comply with a specific schedule of fees when submitting No-Fault claims because pharmacy claims are paid using rates that are calculated based on the drug's average wholesale price—a rate that is often many times greater than a drug's actual acquisition cost.

12.     The defendants secured a steady stream of prescriptions, mainly from non-defendant Atlantic Medical & Diagnostic, P.C. ("Atlantic Medical").

13.     The Defendants enriched themselves at the expense of patients. The scheme generated vast numbers of prescriptions for the Defendants, but the ordering and dispensing of unnecessary drugs placed claimants at risk. Pain Products were prescribed and dispensed indiscriminately, without regard for actual medical need.

14.     Overall, the Defendants operated in violation of New York law by dispensing and billing for drugs and medications that were prescribed pursuant to unlawful referral arrangements, were medically unnecessary, and were excessively charged.

15.     The Defendants knew that they were ineligible to collect No-Fault payments, yet they still created statutory prescribed claim forms (i.e., NF-3 forms and CMS-1500 forms), which falsely certified Argyle's eligibility to collect No-Fault payments under New York law.

16.     Liberty Mutual reasonably relied on the facial validity of the records and bills mailed by the Defendants—and the representations contained therein—when making payments on Argyle's No-Fault claims.

17.     The Defendants knew that the No-Fault claims were false and fraudulent because the bills and documents submitted to Liberty Mutual in support of the claims misrepresented or omitted material facts about Argyle's eligibility to be paid under New York's No-Fault laws.

18.    The success of the Defendants scheme to defraud relied on the transmission to Liberty Mutual, through the U.S. Mail, of invoices, bills, and other No-Fault claim documents warranting the Defendants' eligibility to collect No-Fault payments under New York law.

19.    All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

20.    Liberty Mutual estimates that the Defendants purposely submitted to Liberty Mutual hundreds of bills on behalf of the Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

21.    By this Complaint, Liberty Mutual brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

22.    This action seeks actual damages in excess of $748,350.27, which represent No-Fault payments that Liberty Mutual was wrongfully induced to make to the Defendants during the course of this scheme.

23.    Liberty Mutual also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to the Defendants (or their agents) in connection with any No-Fault claims submitted to Liberty Mutual.

## II.    PARTIES

### A.    PLAINTIFFS

24.    LM Insurance Corporation and LM General Insurance Company are companies duly organized and existing under the laws of the State of Illinois with their principal place of

business in Boston, Massachusetts. LM Insurance Corporation and LM General Insurance Company are authorized to conduct business in the State of New York.

25.     American States Insurance Company is duly organized and existing under the laws of the State of Indiana with its principal place of business in Boston, Massachusetts. American States Insurance Company is authorized to conduct business in the State of New York.

26.     Liberty Mutual Fire Insurance Company and Wausau Underwriters Insurance Company are companies duly organized and existing under the laws of the State of Wisconsin with their principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company and Wausau Underwriters Insurance Company are authorized to conduct business in the State of New York.

27.     Liberty Mutual Personal Insurance Company is duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts. Liberty Mutual Personal Insurance Company is authorized to conduct business in the State of New York.

B.    **DEFENDANTS**

1.    **Argyle Pharmacy Inc**

28.     Argyle is a corporation organized under the laws of the State of New York.

29.     Argyle became a registered pharmacy in New York on August 11, 2020.

30.     Argyle is owned and controlled by Mehtab Bibi and Timur Yuzefpolsky.

31.     Argyle's principal place of business is 1211 Foster Avenue, Brooklyn, NY 11230.

32.     Argyle's activities affect interstate commerce.

33.     The Defendants scheme relied upon unlawful referrals for topical pain products from Atlantic Medical in violation of New York law.

34.    Argyle billed for fraudulent pharmacy services in connection with Liberty Mutual claimants.

35.    Argyle dispensed medically unnecessary Pain Products without regard for patient care and in disregard of its duties under New York law.

36.    Argyle's bills are fraudulent because the pharmacy services were unnecessary and prescribed pursuant to a pre-determined treatment protocol designed to maximize the Defendants' profits at the expense of patient safety and well-being.

37.    Argyle participated in the affairs of the Atlantic Medical enterprise by engaging in an unlawful referral relationship to obtain patients/Liberty Mutual Claimants so Argyle could fraudulently bill Liberty Mutual for unnecessary topical pain products and medications.

38.    Accordingly, Argyle was never eligible to collect No-Fault payments from Liberty Mutual under N.Y. Ins. Law § 5102.

       **2.    Mehtab Bibi**

39.    Bibi resides in New York.

40.    Bibi owns Argyle with Yuzefpolsky.

41.    Bibi, Yuzefpolsky, and Argyle participated in a fraudulent billing scheme for medications prescribed as part of a pre-determined treatment protocol resulting in unlawful referral and kickback arrangements.

42.    Bibi participated in the operation of Atlantic Medical by dispensing topical pain products and medications pursuant to an unlawful referral arrangement during the relevant period and is therefore responsible for the fraudulent pharmacy services billed in connection with Liberty Mutual claimants at issue is this Complaint.

43.     Bibi participated in the affairs of the Argyle enterprise by owning and operating the pharmacy that billed Liberty Mutual for unnecessary topical pain products and medication pursuant to unlawful referrals.

### 3.     Timur Yuzefpolsky

44.     Yuzefpolsky resides in New York.

45.     Yuzefpolsky owns Argyle with Mehtab Bibi.

46.     Yuzefpolsky is a licensed pharmacist.

47.     Yuzefpolsky is the supervising pharmacist for Argyle.

48.     Yuzefpolsky, Bibi, and Argyle participated in a fraudulent billing scheme for medications prescribed as part of a pre-determined treatment protocol resulting in unlawful referral and kickback arrangements.

49.     Yuzefpolsky participated in the operation of Atlantic Medical by dispensing topical pain products and medications pursuant to an unlawful referral arrangement during the relevant period and is therefore responsible for the fraudulent pharmacy services billed in connection with Liberty Mutual claimants at issue is this Complaint.

50.     Yuzefpolsky participated in the affairs of the Argyle enterprise by owning and operating the pharmacy that billed Liberty Mutual for unnecessary topical pain products and medications pursuant to unlawful referrals.

## III.    JURISDICTION AND VENUE

51.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331 and § 1332.

52.     Supplemental jurisdiction over the Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

53.     Venue is proper under 28 U.SC. § 1391(b)(2) whereas the vast majority of the acts known to Liberty Mutual alleged herein were carried out within the Eastern District of New York.

54.     At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

55.     The Defendants used New York arbitrations and state court litigation to monetize their fraud against Liberty Mutual in such a way to essentially finance their fraudulent practices with proceeds paid by Liberty Mutual.

56.     The Defendants pattern of submitting and adjudicating baseless and repetitive claims have themselves helped to perpetuate their RICO violations.

57.     Specifically, the Defendants routinely commence frivolous New York arbitrations and/or state court litigation after Liberty Mutual denies their claims to fraudulently obtain No-Fault benefits that are used to finance the RICO scheme.

58.     The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

59.     As the allegations and causes of action in the within Complaint arise from (a) the Defendants' unlawful acts committed in the State of New York, and (b) the fraudulent billing that Defendants generated and submitted from within the State of New York seeking payment under New York's No-Fault laws, there is no question that there exists a substantial relationship between the transactions at issue and Liberty Mutual's causes of action.

## IV.    NO-FAULT LAWS AND RELEVANT LICENSING STATUTES

### A.    GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS

60.     Liberty Mutual underwrites automobile insurance in the State of New York.

61.    New York's No-Fault laws are designed to ensure that injured victims of automobile accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services, including prescription drugs.

62.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Liberty Mutual claimants.

63.    Under New York's No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of an automobile.

64.    "Basic economic loss" is defined to include "all necessary expenses" for prescription drug services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

65.    No-Fault benefits include at least $50,000.00 per Liberty Mutual claimant for necessary expenses that are incurred for healthcare goods and services, including prescription drugs.

**B.    ELIGIBILITY REQUIREMENTS UNDER NEW YORK'S NO-FAULT LAWS**

66.    Pharmacies are not eligible to collect payment under New York's No-Fault laws if they fail "to meet **any** applicable New York State or local licensing requirement necessary to perform such services in New York."  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

67.    New York's Education Law applies to pharmacies.  *See* N.Y. Educ. Law § 6800, *et seq.*

68.    Under New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons

9

for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

### 1.    **Duties of Pharmacies and Their Owners**

69.    Pharmacy owners and supervising pharmacists "shall be responsible for the proper conduct of [the] pharmacy." N.Y. Educ. Law § 6808(2)(e).

70.    "No pharmacist shall have personal supervision of more than one pharmacy at the same time." *Id.*

71.    Only a licensed pharmacist or pharmacy intern may perform professional pharmacy services. *See* 8 N.Y.C.R.R. § 63.6; 8 N.Y.C.R.R. § 29.7(21).

72.    Pursuant to 8 N.Y.C.R.R. § 63.6(b)(7), "[p]harmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed or delivered to the patient," which "review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

73.    With regard to both off-premises and on-premises deliveries of drugs and medications, nothing in either delivery scenario "shall prevent a pharmacist or pharmacy intern from refusing to dispense a prescription if, in his or her professional judgment, potential adverse effects, interactions or other therapeutic complications could endanger the health of the patient." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(e), § 63.6(b)(8)(ii)(d)(5).

74.    For a drug or medication that is delivered on the pharmacy's premises, before dispensing a medication to a new patient or a new medication to an existing patient, the pharmacist or pharmacy intern must personally counsel the patient by telephone or in person on appropriate

10

matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications. 8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)-(b).

75.    When dispensing a drug or medication to a patient off of pharmacy premises, the pharmacist or pharmacy intern must "include with each prescription a written offer to counsel the patient" regarding the drug or medication, including its "known indications" and "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)(1), (4), § 63.6(b)(8)(ii)(a).

76.    The written offer of counseling for drugs dispensed off of pharmacy premises "shall provide a telephone number at which a licensed pharmacist or pharmacy intern may be readily reached." 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(a).

77.    When dispensing a drug or medication to a patient off of pharmacy premises, if a pharmacist or pharmacy intern determines that the prescription(s) present "potential drug therapy problems which could endanger the health of the patient," such as "therapeutic duplications, drug-drug interactions and drug-allergy interactions," the pharmacist or pharmacy intern "shall personally contact the patient" either by phone or in person to "offer counseling on the identified potential drug therapy problems" and other issues that the pharmacist or pharmacy intern deems appropriate in their judgment. 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d), (1).

78.    The responsibility of offering counseling to patients in these situations "shall not be delegated to an individual not authorized to practice pharmacy under a license or limited permit." 8 N.Y.C.R.R. § 68.6(b)(8)(ii)(d)(2).

79.    If the patient refuses to accept counseling, such refusal must be documented. 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(4).

80.    An individual who is not a licensed pharmacist is not authorized to perform functions requiring professional judgment, and thus cannot "interpret and evaluate a prescription for conformance with legal requirements, authenticity, accuracy and interaction of the prescribed drug with other known prescribed and over-the-counter drugs," cannot "sign or initial any record of dispensing required to be maintained by law," and cannot "counsel patients."  8 N.Y.C.R.R. § 29.7(a)(21)(ii)(b)(2), (5), (6), (7).

81.    Aiding and abetting an unlicensed person to practice a profession, including pharmacy, is considered a crime.  N.Y. Educ. Law § 6512.

## 2.    Unlawful Prescription Referral Arrangements

82.    New York law prohibits registered pharmacies from exploiting patients for financial gain.  8 N.Y.C.R.R. § 29.1(b)(2) (prohibiting registered pharmacies from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party").

83.    New York law prohibits registered pharmacies from engaging in unlawful referral relationships.  *Id.* at § 29.1(b)(3) (prohibiting registered pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.").

84.    New York Education Law § 6509-a prohibits a professional licensee, including a licensed pharmacist, from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

85.     Likewise, under New York Public Health Law § 238-a, a practitioner authorized to order pharmacy services may not make a referral for such services to a healthcare provider authorized to provide such services, including to pharmacies, where such practitioner has a financial relationship with such healthcare provider.   A financial relationship includes a compensation agreement and includes an arrangement with a healthcare provider that is in excess of fair market value or that provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties.   N.Y. Pub. Health Law § 238-a(1), (5); *see also* N.Y. Educ. Law § 6530(18) (defining professional misconduct of physicians and physician assistants to include "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services"); N.Y. Educ. Law § 6530(38) (defining professional misconduct of physicians and physician assistants to include "[e]ntering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions").

86.     It is a crime for "[a]ny person to enter into an agreement with a physician…for the compounding or dispensing of secret formula (coded) prescriptions."  N.Y. Educ. Law § 6811.

### 3.     Electronic Prescription Mandate

87.     New York law requires electronic prescriptions for both controlled and non-controlled substances.  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

88.     The electronic prescription mandate was intended to reduce prescription drug fraud and misuse.  *See* N.Y. Senate Bill S7637 (2011-2012 Leg. Session) (explaining how "E-prescribing is a secure method of transmitting prescriptions from practitioners to pharmacists. Since an e-prescription cannot be physically altered, forged, or stolen …, it curtails prescription fraud.").

89.     There are few exceptions to the electronic prescription mandate, such as when electronic prescribing is not available due to temporary technological or electrical failure, where the prescribing provider has obtained a waiver, or where drugs cannot be prescribed electronically in a timely manner (and such delay would adversely impact the patient's medical condition).  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

90.     If a prescription is not issued electronically, then the prescribing provider must indicate in the patient's health record the reason that the prescription was not issued electronically. N.Y. Educ. Law § 6810(11)-(12).

91.     If the prescriber has obtained a waiver from the New York Department of Health because of "exceptional circumstances," then the prescriptions must be issued using an Official New York State Prescription Form or an oral prescription in accordance with New York law. N.Y. Educ. Law § 6810(10)(c); N.Y. Pub. Health Law § 281(3).

92.     Absent one of these limited exceptions, prescribing providers must prescribe all drugs and medications electronically.

### C.     CLAIMING REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS

93.     Claimants can assign their No-Fault benefits directly to pharmacies.

94.     Under a duly executed assignment, a claimant's pharmacy may submit claims directly to an insurance company and receive payment for necessary pharmacy services rendered. 11 N.Y.C.R.R. § 65.3-11(a).

95.     Pharmacies can submit claims using the claim form required by the New York State Department of Financial Services f/k/a New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3 form").  11 N.Y.C.R.R. § 65.3-11(b).

96.    Alternatively, pharmacies may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

97.    NF-3 and CMS-1500 forms are important because they certify that the pharmacy's request for payment is not materially false, misleading, or fraudulent, subject to the following warning:

> "Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime[.]"

N.Y. Ins. Law § 403(d).

98.    Pharmacies make material misrepresentations when they submit NF-3 or CMS-1500 forms that omit or misrepresent material information about the billed-for services or the pharmacies' eligibility to collect No-Fault payments.

99.    It is a material misrepresentation to submit NF-3 or CMS-1500 forms for prescription drugs that (a) are never provided, (b) are not necessary, (c) are referred to the pharmacy pursuant to unlawful arrangements with prescribing providers, (d) are dispensed without required supervision or regard for patient safety and well-being, and/or (e) are billed at a greater monetary charge than is permitted under the applicable fee schedule.

**D.    REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER NEW YORK'S NO-FAULT LAWS**

100.    A pharmacy's misrepresentations regarding compliance with the applicable fee schedule is material because the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

101.    The Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

102.    The Fee Schedule applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq*.

103.    The NDC is a unique 10-digit, 3-segment numeric identifier assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged. Each NDC number has a corresponding AWP, which identifies the price.

104.    AWP means the average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed. 12 N.Y.C.R.R. § 440.2(a).

105.    For charges submitted by pharmacies for brand name and generic prescription drugs or medicines on or after October 1, 2019, 12 N.Y.C.R.R. § 440.5(a)(1)(ii) states that a provider may charge no more than, as applicable here, the lesser of the calculated cost or the usual and customary price for the prescription drug or medication.

106.    "Calculated cost means the average wholesale price for the national drug code of the prescription drug or medicine on the day it was dispensed plus a dispensing fee. For brand name drugs the Calculated cost shall be AWP minus twelve percent of the Average Wholesale price plus a dispensing fee of four dollars. For generic drugs the Calculated cost shall be AWP minus twenty percent plus a dispensing fee of five dollars." 12 N.Y.C.R.R. § 440.2(c).

107.    "Usual and customary price means the retail price charged to the general public for a prescription drug." 12 N.Y.C.R.R. § 440.2(s).

108.    Under New York's No-Fault Laws, healthcare providers, including pharmacies, are prohibited from submitting charges that exceed the amounts set forth in the Fee Schedule.

109.    Additionally, New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet **any** applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

110.    Accordingly, if a professional healthcare service provider, including a pharmacy, fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

111.    As alleged herein, the Defendants failed to meet several laws and regulations when providing pharmacy services to claimants during the course of this scheme; therefore, Argyle was never eligible to collect No-Fault payments from Liberty Mutual.

## V.    SPECIFIC FACTS ABOUT THE DEFENDANTS' SCHEME TO DEFRAUD

### A.    OVERVIEW OF THE DEFENDANTS' SCHEME

112.    At all relevant times, Argyle failed to comply with New York law governing pharmacies and was not eligible to seek or receive payments under New York's No-Fault laws as a result of the Defendants' scheme to defraud.

113.    The overarching purpose of the Defendants' scheme was to obtain No-Fault payments that the Defendants were not entitled to receive for their personal benefit.

114.    The Defendants achieved this goal by submitting charges for a pre-determined treatment protocol of medically unnecessary and expensive drugs and medications, including Pain Products.

115.    The Defendants selected those drugs and medications comprising this pre-determined treatment protocol to include those that could be acquired at low cost and then billed at inflated rates to maximize the Defendants' profits.

116.    As explained below, there is significant evidence that the prescriptions for drugs and medications billed by the Defendants to Liberty Mutual under New York's No-Fault laws were funneled to the Defendants pursuant to an unlawful referral relationship with the providers.

117.    The Defendants devised and executed their scheme knowing that (a) the prescriptions were issued pursuant to pre-determined treatment protocols of medically unnecessary and ineffective drugs and medications, which elevated profits over genuine patient care, (b) the prescriptions were invalid under New York law, (c) the prescriptions were issued in exchange for unlawful kickbacks or other incentives, and (d) the No-Fault claim documents submitted to Liberty Mutual falsely represented the Defendants' eligibility to collect No-Fault payments.

### B.    PRE-DETERMINED TREATMENT PROTOCOL

118.    The Defendants' scheme was designed such that prescribers were limited to a pre-determined set of drugs and medications; in doing so, the Defendants ensured that these drugs and medications were prescribed in all cases, regardless of whether the patients even needed or wanted them.

119.    As a result, the Defendants billed Liberty Mutual for the same recurring set of unnecessary, unwarranted, and ineffective Pain Products, including: Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, Cyclobenzaprine 7.5 mg tablets, Naproxen and Baclofen.

120.    The Defendants focused on billing for these expensive Pain Products even though substantially similar products were available as over-the-counter drugs at a fraction of the cost.

121.    The Defendants intentionally based their fraudulent scheme on steering providers to prescribe these specific Pain Products to be billed for by the Defendants, in place of other less expensive products, to maximize the amounts collected by the Defendants in violation of New York's No-Fault laws.

122.    The chart attached at Exhibit 1 lays bare the Defendants' disproportionate focus on billing for Pain Products, including the following most commonly billed-for products:

| **Drug Name** | **NDC** |
|---|---|
| Cyclobenzaprine HCL 7.5 mg oral tablet | 72888-0013-01 |
| Naproxen | 55111-0701-60 |
| Naproxen | 50228-0433-05 |
| Lidocaine 5% Ointment | 62332-0424-50 |
| Lidocaine 5% Ointment | 51672-3008-05 |
| Diclofenac Sodium 3% Gel | 51672-1363-07 |
| Baclofen | 59651-0395-99 |

123.    The same Pain Products were ordered for different claimants on the same day with each provider location showing a pattern of prescriptions, which is evidence that these medications were prescribed as part of a pre-determined treatment protocol without any regard for whether the Pain Product(s) was necessary or effective.

124.    Below is a true and accurate representative sample of the billing for the pattern of prescriptions by Atlantic:

| Healthcare provider | Claimant | Claim Number | Date | Medication |
|---|---|---|---|---|
| Atlantic Medical | G.H. C.H. | 054388953 054388953 | 10/25/22 | Baclofen Lidocaine 5% Ointment Tylenol |
| Atlantic Medical | E.J. D.H. | 051423283 051136931 | 11/15/22 | Baclofen Ibuprofen Lidocaine 5% Ointment |

| Healthcare provider | Claimant | Claim Number | Date | Medication |
|---|---|---|---|---|
| Atlantic Medical | C.H. | 054388953 | 9/22/23 | Cyclobenzaprine<br>Lidocaine 5% Ointment<br>Ibuprofen |
| Atlantic Medical | G.H. | 054388953 | 9/22/23 | Cyclobenzaprine<br>Lidocaine 5% Ointment<br>Acetaminophen |
| Atlantic Medical | B.B.<br>K.B. | 057954063<br>057954063 | 10/8/24 | Diclofenac Sodium 3% Gel<br>Lidocaine 5% Ointment<br>Pharbetol (Acetaminophen)<br>Cyclobenzaprine |

125.    In addition to the pre-determined protocol shown by the same prescriptions being given to multiple patients on the same day, some even under the same claim numbers, the Defendants used the provider entities to prescribe Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, Cyclobenzaprine, Naproxen, and Baclofen, without regard for efficacy or patient safety.

126.    The Defendants targeted and selected these particular Pain Products because they could be acquired at a low cost and then billed to Liberty Mutual in terms of the drugs' AWP, which allowed the Defendants to realize a substantial profit for every prescription at Liberty Mutual's and the claimants' expense.

### C.    DEFENDANTS' UNLAWFUL REFERRAL RELATIONSHIP WITH ATLANTIC MEDICAL

127.    The Defendants' scheme to defraud required a high volume of facially valid prescriptions to permit Argyle to submit charges for prescription Pain Products.

128.    To maintain a steady flow of prescriptions for a particular set of expensive Pain Products, the Defendants colluded with the health care providers at Atlantic Medical who specialize in No-Fault and had large available patient bases for the Defendants to take advantage of.

129.    Atlantic Medical generated prescriptions for Pain Products in accordance with the Defendants' pre-determined prescription protocol regardless of whether the patients needed, or even wanted, the drugs and medications.

130.    Upon information and belief, the Defendants paid kickbacks or other incentives to Atlantic Medical employees in exchange for these unlawful prescriptions in violation of New York law.

131.    Atlantic Medical funneled these prescriptions to Argyle without giving the patients any choice of where to fill the prescriptions.

132.    This unlawful referral relationship was crucial to the success of the Defendants' scheme to defraud and resulted in false and fraudulent charges for medically unnecessary and expensive drugs and medications, including Pain Products.

### 1.    Atlantic Medical History of Fraudulent Activity

133.    Atlantic Medical has a history of being accused of engaging in fraudulent activity under New York's No-Fault laws.

134.    Atlantic Medical is alleged to be part of a scheme where the P.C is used to funnel fraudulent billing to insurance companies for excessive and unnecessary treatment and unlawful referrals *See Allstate Ins. Co., et al v. Jonathan S. Landow M.D., et al*, No. 1:24-cv-02010-DLI-JRC (E.D.N.Y., 2024); *United States Automobile Association, et al v. Landow M.D., et al,* 1:24-cv-03471-NRM-MMH (E.D.N.Y., 2024); *GEICO, et al v. Landow, M.D., et al,* 1:21-cv-01440-NGG-RER; *Travelers Insurance, et al v. Jonathan Landow, et al* (NY County 656567/2021)

135.    Treatment of patients at Atlantic Medical also resulted in patients being prescribed medication, without even being consulted by the doctors treating them at Atlantic Medical. *Id*.

136.    Atlantic Medical was allegedly under the control of one or more non-physicians who dictated management and course of treatment. *Id*.

137.    There was an unlawful sharing of professional physician fees with non-physicians. *Id*.

138.    Billing for services rendered based on unlawful referral and unnecessary healthcare services. *Id*.

D.    **DEPRIVING CLAIMANTS' CHOICE OF PHARMACY**

139.    The Defendants and health care providers ensured that prescriptions were funneled directly to the Defendants to permit the Defendants to bill for the prescribed drugs and medications without giving the claimants a choice of pharmacy.

140.    Claimants received the medications billed to Liberty Mutual by the Defendants directly at the No-Fault clinics or through delivery to their homes.

141.    The Defendants chose to deliver these medications directly to patients because the Defendants' physical locations were not convenient to the majority of its claimants.

142.    The chart below contains representative examples illustrating the considerable distance between Argyle's physical location at 1211 Foster Avenue, Brooklyn, NY, 11230-1607 and the residences of many of its Liberty Mutual claimants:

| Claimant | Claim Number | Claimant's Residence | Approximate Miles From Argyle |
|---|---|---|---|
| B.B. | 057954063 | Jamaica, NY | 14.2 |
| K.B. | 057954063 | West Hempstead, NY | 22.6 |
| G.G. | 057956807 | Freeport, NY | 30.0 |
| B.K. | 057837511 | Hempstead, NY | 24.9 |
| L.C. and J.C. | 055263747 | Elmont, NY | 21.9 |
| J.P. | 056810995 | Westbury, NY | 34.6 |
| T.A. | 056826786 | Baldwin, NY | 22.2 |
| I.R. | 056956130 | New York, NY | 16.0 |

143.    The health care providers and the Defendants eliminated any option of pharmacy by choosing Argyle for the patients and immediately filling and directly dispensing the drugs and medications to the claimants at the No-Fault clinics or their residences.

E.    UNNECESSARY PAIN PRODUCTS

144.    Argyle billed Liberty Mutual for Pain Products, including Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, Cyclobenzaprine, Naproxen, and Baclofen that were medically unnecessary, not indicated for the treatment of musculoskeletal injuries, and/or chosen for their potential reimbursement value over lower-priced alternatives available over-the-counter.

145.    Pain medications, including topical NSAIDs, lack proven effectiveness for the treatment of widespread musculoskeletal pain.

146.    Pain medications may be indicated where the patient failed a trial of oral medications, has specific allergies to certain oral medications, or is incapable of swallowing pills.

147.    However, despite no documentation of an intolerance to oral NSAIDs or muscle relaxants, Argyle's claimants were prescribed both topical and oral NSAIDs to treat a diagnosis of musculoskeletal pain.

148.    The topical Pain Products billed to Liberty Mutual by Argyle are not approved or intended to treat musculoskeletal injuries; rather, they are approved for the treatment of superficial pain, skin conditions, or nerve pain.

149.    Less toxic formulations of topical Lidocaine and Diclofenac are available over-the-counter at significantly lower cost.

150.    By prescribing and dispensing a pre-determined treatment protocol of among the most expensive pain medications, the Defendants subjected the patients to unnecessarily high

concentrations of Pain Products intended to treat conditions other than musculoskeletal pain for the purpose of exploiting these patients' available No-Fault benefits.

### 1.    Unnecessary Lidocaine 5% Ointment

151.    Argyle billed Liberty Mutual for Lidocaine 5% Ointment.  *See* Exhibit 2.

152.    Lidocaine 5% Ointment is not a first-line treatment for musculoskeletal pain; rather, it is indicated for temporary pain relief for minor burns, skin abrasions, insect bites, and as a topical anesthetic.

153.    Indeed, the product labeling for Lidocaine 5% Ointment indicates that the drug is not effective when applied on intact skin, which is because Lidocaine 5% Ointment is incapable of sufficiently penetrating intact skin.  Even though topical Lidocaine is sometimes used to treat neuropathic pain in adults, high concentrations of the drug must be used because topical Lidocaine crosses the skin poorly.

154.    The patients prescribed Lidocaine 5% Ointment billed to Liberty Mutual by Argyle did not have any documented minor skin conditions or true neuropathic pain warranting Lidocaine 5% Ointment.

155.    Argyle billed Liberty Mutual $1,904.75 pursuant to Code 51762300805 for Lidocaine 5% Ointment.

156.    A true and accurate copy of a representative invoice is depicted below:

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 10/25/2022 | see below* | Baclofen 20MG Tab QTY:30 | NDC 29300034401 | 153.90 |
| 10/25/2022 | see below* | Ibuprofen 800MG Tab QTY:60 | NDC 59651036205 | 26.78 |
| 10/25/2022 | see below* | Lidocaine Oin 5% QTY:250 | NDC 51672300605 | 1904.75 |
| 10/25/2022 | see below* | Dispensing Fee | S9430 | 5.00 |
| *1211 Foster Ave Brooklyn, NY 11230 | | | TOTAL CHARGES TO DATE$ | 2090.43 |

157.    Moreover, Lidocaine 4% Cream under the brand name Aspercreme is available at neighborhood pharmacies at a small fraction of the amount charged by Argyle for the Lidocaine 5% Ointment.

158.    True and accurate representations of Aspercreme are depicted below:





159.    Argyle's bills for Lidocaine 5% Ointment are fraudulent and Liberty Mutual is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibit 2.

160.    All fraudulent Lidocaine 5% Ointment billed in connection with Liberty Mutual claimants traveled through U.S. Mail.

**2.    Unnecessary Diclofenac Sodium 3% Gel**

161.    Argyle billed Liberty Mutual for Diclofenac Sodium 3% Gel.  See Exhibit 3.

162.    The Defendants billed for massive quantities of Diclofenac Sodium 3% Gel, which is not effective, approved, or indicated for the topical treatment of musculoskeletal injuries, such as those sustained in a motor vehicle accident.

163.    A true and accurate representation of the FDA approval of Diclofenac Sodium 3% Gel is depicted below:

SkyePharma Inc.
Attention: Gordon L. Schooley, Ph.D.
Senior Vice President, Clinical Research & Regulatory Affairs
10450 Science Center Drive
San Diego, CA 92121

Dear Dr. Schooley:

Please refer to your new drug application (NDA) dated October 20, 1998, received October 22, 1998, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Solaraze (diclofenac sodium) Gel, 3%.

Please refer to our action letters dated October 21, 1999, and July 19, 2000.

We acknowledge receipt of your submissions dated July 28, August 15, September 22, and October 3, 2000.  Your submission of August 15, 2000, received August 16, 2000, constituted a complete response to our July 19, 2000 action letter.

This new drug application provides for the use of Solaraze (diclofenac sodium) Gel for the topical treatment of actinic keratoses.

We have completed the review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the agreed upon enclosed labeling text.  Accordingly, the application is approved effective on the date of this letter.

164.    Diclofenac Sodium Gel is approved for topical treatment of actinic keratoses.

165.    The use of Diclofenac Sodium 3% Gel in patients without osteoarthritis exposes the patients to increased and unnecessary risks for skin irritation, hypersensitivity, and photosensitivity.

166.    Diclofenac Gel also exists in a 1% concentration; it is an NSAID that may be effective in the treatment of pain in the peripheral joints, such as the hand or knee, but it has no proven efficacy for pain relief for larger and deeper joints, such as the spine or shoulder, to which the gel cannot penetrate.

167.    Simply because Diclofenac Sodium 3% Gel is more concentrated than Diclofenac Sodium 1% or 2% Gel does not mean that Diclofenac Sodium 3% Gel is more effective for the treatment of joint pain, for which condition Diclofenac Sodium 3% Gel is not indicated.

168.    Diclofenac Sodium 3% Gel is substantially more toxic topically and systematically than Diclofenac Sodium 1% Gel.

169.    The Fee Schedule calls for reimbursement of Diclofenac Sodium 3% Gel at a much higher rate than generic Diclofenac Sodium 1% Gel.

170.    The generic Diclofenac Sodium 3% Gel billed to Liberty Mutual by the Pharmacy Defendants has an AWP of $111.56 per 100-gram package under NDC 51672-1363-07, or an AWP  of $1,179.46 per 100 gram package under NDC 00482-1783-10.

171.    Generic Diclofenac Sodium 1% Gel (NDC No. 69097-0524-44) has an AWP of less than $53.00 per 100-gram package.

172.    Therefore, the Defendants could charge no more than $85.00 for each prescription of 200 grams of generic Diclofenac Sodium 1% Gel.

173.    However,  for each prescription of 100 grams of generic Diclofenac Sodium 3% Gel, the Defendants could charge approximately $89.25 under NDC No. 51672-1363-07 and over $940.00 under NDC No.00472-1783-10.

174.    In fact, Argyle charged Liberty Mutual $1,179.50 per 100-gram package under NDC 51672-1363-07, and both $1,179.50 and $2,359.00 per 100-gram package under NDC 00472-1783-10.

175.    Diclofenac Sodium 1% Gel is available over-the-counter; a 100-gram tube of Voltaren Topical 1% Gel may be purchased at retail without a prescription for less than $23.00.

176.    True and accurate representations of Voltaren are depicted below:



177.    Accordingly, the Defendants were motivated by profit to ensure that the Referring Providers ordered Diclofenac Sodium 3% Gel for their patients instead of the less expensive Diclofenac Sodium 1% Gel even though the 3% preparation is neither approved nor effective at treating joint pain.

178.    Argyle was not eligible for No-Fault reimbursement for the Diclofenac Sodium 3% Gel billed to Liberty Mutual because these drugs were not medically necessary or effective in treating the claimants' musculoskeletal conditions.

179.    The Defendants induced the Referring Providers to prescribe Diclofenac Sodium 3% Gel to permit the Defendants to submit inflated and/or excessive charges for this product.

180.    Argyle's bills for Diclofenac Sodium 3% Gel that traveled through the U.S. Mail are fraudulent and Liberty Mutual is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibit 3.

**3.    Unnecessary Cyclobenzaprine**

181.    Argyle billed Liberty Mutual for Cyclobenzaprine.  *See* Exhibit 4.

182.    Cyclobenzaprine is a muscle relaxant intended for short term use to treat muscle paint and reduced range of motion caused by muscle spasms.  Short term use is defined as 2-3 weeks.

183.    Prolonged use of Cyclobenzaprine often requires a weaning off period, or the patient is at an increased risk of nausea, headache and malaise.

184.    The Defendants' pre-determined treatment protocol has Liberty Mutual claimants prescribed Cyclobenzaprine for months after the date of accident, reducing the risk of efficacy and increasing the risk of harmful side effects demonstrating a clear example of profits over patient care.

185.    By prescribing and dispensing a pre-determined treatment protocol of among the most expensive pain medications, Atlantic Medical and the Defendants subjected the patients to unnecessarily high concentrations of Pain Products intended to treat conditions other than musculoskeletal pain for the purpose of exploiting these patients' available No-Fault benefits.

186.    Argyle's bills for Cyclobenzaprine are fraudulent and Liberty Mutual is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibit 4.

187.    All fraudulent Cyclobenzaprine billed in connection with Liberty Mutual claimants traveled through the U.S. Mail.

### 4.    Unnecessary Naproxen

188.    Argyle billed Liberty Mutual for Naproxen.  *See* Exhibit 5.

189.    Naproxen is classified as a nonsteroidal anti-inflammatory drug (NSAID), and while indicated as an appropriate first-line pharmacological agent in treating mild to moderate pain, it is not intended for long term use.  NSAIDs can be recommended for 2-3 weeks in the immediate onset of injury to treat pain and inflammation.

190.    Naproxen is not recommended for longer than the 2-3 week period, as it increases the risk of heart attack, stroke, and gastrointestinal issues such as ulcers and bleeding.

191.    Argyle also billed for Naproxen and Esomeprazole, also known as Vimovo.  The combination combines the NSAID of Naproxen with a proton-pump inhibitor, Esomeprazole, which is intended to decrease the risk of developing stomach ulcers.

192.    Vimovo, however, is only FDA approved to treat symptoms relating to osteoarthritis, rheumatoid arthritis and ankylosing spondylitis in patients, and decrease the risk of developing NSAID related gastric ulcers.

193.    By prescribing and dispensing a pre-determined treatment protocol of among the most expensive pain medications, the Defendants subjected the patients to unnecessarily high concentrations of Pain Products intended to treat conditions other than musculoskeletal pain for the purpose of exploiting these patients' available No-Fault benefits.

194.    Notably, Naproxen is available over-the-counter at a fraction of the cost as seen below.



195.    All of the claims identified in Exhibit 5 contain extended and dangerous prescriptions for Naproxen for months after the dates of accident, well past the medical standard of care time frame for Naproxen to be appropriately prescribed.

196.    Argyle billed Liberty Mutual $2,900.00 pursuant to code 55111-0701-60 for Naproxen.

197.    A true and accurate copy of a representative invoice is depicted below:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 10/01/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | CYCLOBENZAPRINE HYDR 10mg TAB.. | 30 | NDC:52817-0332-00.. | $32.76 |
| 10/01/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | NAPROXEN ESOMEPRAZO 500-20MG TAB | 60 | NDC:55111-0701-60 | $2900.00 |
| 10/01/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | Dispensing Fee | 1 | S9430 ... | $5.00 |

TOTAL CHARGES TO DATE $2937.76

198.    Argyle's bills for Naproxen are fraudulent and Liberty Mutual is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibit 5.

199.    All fraudulent Naproxen billed in connection with Liberty Mutual claimants traveled through the U.S. Mail.

### 5.    Unnecessary Baclofen

200.    Argyle billed Liberty Mutual for Baclofen.  *See* Exhibit 6.

201.    Baclofen is a muscle relaxant used as a second or third line of care for treating injuries related to motor vehicle accidents.

202.    It is a muscle relaxant that should only be used for short term and with extreme caution.

203.    Long term use of this medication is not accepted as it has habit forming potential, risk of seizure if stopped abruptly and has also lead to death.

204.    Moreover, with any muscle relaxant there is a concern for sedation, and therefore they should only be used with extreme caution.

205.    Argyle billed Liberty Mutual $153.90 pursuant to code 29300-0344-01 for Baclofen.

206.    A true and accurate copy of a representative invoice is depicted below:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 10/25/2022 | see below* | Baclofen 20MG Tab QTY:30 | NDC 29300034401 | 153.90 |
| 10/25/2022 | see below* | Lidocaine Oin 5% QTY:250 | NDC 51672300805 | 1904.75 |
| 10/25/2022 | see below* | Tylenol*G* 325MG Qty:120 | NDC 57896010201 | 2.64 |
| 10/25/2022 | see below* | Dispensing Fee | 89430 | 5.00 |

*1211 Foster Ave Brooklyn, NY 11230 — TOTAL CHARGES TO DATES 2066.29

207. Argyle's bills for Baclofen are fraudulent and Liberty Mutual is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibit 6.

208. All fraudulent Baclofen billed in connection with Liberty Mutual claimants traveled through the U.S. Mail.

**F.    FAILURE TO LAWFULLY OVERSEE DISPENSING OF DRUGS AND MEDICATIONS**

209. Nearly all of the Liberty Mutual claimants were prescribed Pain Products.

210. Topical Lidocaine, and NSAIDs in general, may cause side-effects, including damage to the intestines, the lining of the stomach, and other serious medical problems.

211. Therefore, when an oral NSAID, such as Cyclobenzaprine, is taken in conjunction with a topical NSAID, like Lidocaine, there are certain health risks to the patient.

212. Heath care providers prescribed both oral and topical NSAIDs to the same patient without properly considering the potentially harmful effects.

213. The Defendants dispensed to patients both the oral and topical NSAIDs without conducting a proper review to avoid therapeutic duplication presenting a risk to the health and safety of the claimants.

214.   An individual who is not a licensed pharmacist is not authorized to perform functions requiring professional judgment, including evaluating prescriptions for drug interactions and counseling patients. 8 N.Y.C.R.R. § 29.7(a)(21)(ii)(b)(1), (2), (6), (7).

215.   Argyle's receipts do not identify who delivered the drug or medication to the patient.

216.   Upon information and belief, Argyle's patients were not personally offered counseling on the issues raised by the prescriptions for both oral and topical NSAIDs, including therapeutic duplication, by a pharmacist or pharmacy intern over the phone or in person before the drugs and medications were delivered to the patients off of Argyle's premises.

217.   In many instances, the delivery receipts purporting to confirm delivery of medications to claimants fail to document whether the claimant requested counseling.

218.   The receipt for the Cyclobenzaprine, Ibuprofen and Lidocaine Ointment purportedly delivered to claimant J.P. (claim 056810995) by Argyle leaves pertinent portions of the receipt blank, including whether J.P. requested counseling, who delivered it, and at what time.

219.   A true and accurate copy of the delivery slip for claimant J.P. is depicted below.



220.    The receipt for the Lidocaine 5% Ointment and Naproxen purportedly delivered to J.B. (claim 054902430) by Argyle is leaves pertinent portions of the delivery slip blank such as if the J.B. requested counseling, who delivered the medications and at what time.

221.    A true and accurate copy of the delivery receipt for J.B. is below.



222.    The receipt for the Lidocaine 5% Ointment and Cyclobenzaprine to claimant C.C. (claim 057402169) by Argyle leaves pertinent portions of the delivery slip blank, including the receiver's name, whether C.C. requested counseling, who delivered the medication, and at what time.

223.    A true and accurate copy of the delivery receipt for C.C. is below.

224.    The Defendants and the healthcare providers disregarded patient safety when prescribing, dispensing and delivering duplicative and medically unnecessary topical medications with oral NSAIDs in furtherance of their scheme to prescribe and bill for as many drugs and medications as possible.

225.    The Defendants violated their duty to their patients to identify risks posed by the therapeutic duplication of topical and oral NSAIDs and to provide an offer of appropriate counseling personally from a licensed pharmacist or pharmacy intern over the telephone or in person before the medications were delivered off of the Defendants' premises.

**G.    EXCESSIVE CHARGES**

**1.    Lidocaine 5% Ointment**

226.    The Defendants also exploited the AWP and WAC for Lidocaine 5% Ointment, which Argyle billed under NDC Nos. 51672-3008-05, 62332-0424-50, and 65162-0918-53.

227.    The comparison between Lidocaine 5% Ointment  and Lidocaine 4% Ointment, commonly known as Aspercreme is shown below:

37

| Drug | NDC | AWP2 |
|------|-----|------|
| Lidocaine 5% Ointment | 51672-3008-05 | $7.62/gram |
| Lidocaine 4% Ointment (Aspercreme) | 41167-0584-00 | $2.61/gram |

228.    Argyle billed $1,904.75 for a 250 gram supply of Lidocaine 5% Ointment under NDC No. 51672-3008-05.

229.    As shown above, AWP of a 50 gram supply of Lidocaine 5% Ointment sold under NDC No. 51672-3008-05 was approximately $380.93.

230.    Argyle could charge approximately $1,523.72 for a 250 gram supply of Lidocaine 5% Ointment (after application of the 20% reduction required under applicable New York law) under NDC No. 51672-3008-05.

231.    The WAC for Lidocaine 5% Ointment sold under NDC No. 51672-3008-05 is $50.00 per 50 grams.

232.    Acquiring Lidocaine 5% Ointment at or around the WAC meant that the Defendants realized a profit of over $1,654.75 each time that Argyle billed for 250 grams of Lidocaine 5% Ointment under NDC No. 51672-3008-05.

233.    The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

234.    A true and accurate representation of an invoice for Lidocaine 5% Ointment as billed for Liberty Mutual claimant C.H., claim number 051351332, is below:

---

[2] All references to AWP unit pricing and AWP or WAC package pricing are rounded to the nearest whole cent, resulting in an approximate calculation to the nearest cent.

235.    The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

236.    All fraudulent Lidocaine 5% Ointment billed in connection with Liberty Mutual claimants traveled through U.S Mail.

### 2.    Diclofenac Sodium 3% Gel

237.    The Defendants also exploited the AWP and WAC for Diclofenac Sodium 3% Gel, which Argyle billed under NDC Nos. 51672-1363-07 and 00472-1783-10.

238.    For example, Argyle routinely billed Liberty Mutual at least $1,179.50 for a 100 gram supply of Diclofenac Sodium 3% Gel under NDC No. 51672-1363-07.

239.    The published AWP of a 100 gram supply of Diclofenac Sodium 3% Gel sold under NDC No. 51672-1363-07 is approximately $111.56.

240.    The AWP of $111.56 for Diclofenac Sodium 3% Gel sold under NDC No. 51672-1363-07 became effective on or around November 15, 2023.

241.    Prior to this date, the AWP for Diclofenac Sodium 3% Gel sold under NDC No. 51672-1363-07 was $1,179.46, which went into effect on or around April 29, 2016.

242.    This change in AWP is representative of a 90% difference in price.

243. A true and accurate example of Argyle billing for Diclofenac Sodium 3% Gel sold under NDC No. 51672-1363-07 prior to November 15, 2023 is depicted below:



244. At no point did Argyle ever change their billing habits when dispensing Diclofenac Sodium 3% Gel sold under NDC No. 51672-1363-07 after November 15, 2023.

245. A true and accurate example of Argyle billing for Diclofenac Sodium 3% Gel sold under NDC No. 51672-1363-07 after November 15, 2023 is depicted below:



246. Argyle charged Liberty Mutual at least $1,067.00 more than what was required every time it dispensed Diclofenac Sodium 3% Gel under NDC No. 51672-1363-07 after November 15, 2023.

247. There is no evidence that Diclofenac Sodium 3% Gel was required when Diclofenac Sodium 1% Gel could have been provided at a fraction of the cost.

| Drug | NDC | AWP |
|---|---|---|
| Diclofenac Sodium 3% Gel | 51672-1363-07 | $1.12/gram |
| Diclofenac Sodium 1% Gel (Voltaren) | 50090-6202-00 | $0.31/gram |

248.   Argyle could charge approximately $89.25 for a 100 gram supply of Diclofenac Sodium 3% Gel (after application of the 20% reduction required under applicable New York law) under NDC No. 51672-1363-07.

249.   The WAC for Diclofenac Sodium 3% Gel sold under NDC No. 51672-1363-07 is $92.97 per 100 gram.

250.   Acquiring Diclofenac Sodium 3% Gel at or around the WAC meant that the Defendants realized a profit of over $1,086.53 each time that Argyle billed for 100 units of Diclofenac Sodium 3% Gel under NDC No. 51672-1363-07.

251.   The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

252.   A true and accurate representation of an invoice for Diclofenac Sodium 3% Gel  as billed for Liberty Mutual claimant L.R., claim number 05631216901, is below:

**15. REPORT OF SERVICES RENDERED – ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 08/12/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | DICLOFENAC SODIUM 3% GEL | 100 | NDC:00472-1783-10 | $ 1179.50 |
| 08/12/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | LIDOCAINE 5% OINT | 250 | NDC:62332-0424-50 | $ 1904.50 |
| 08/12/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | TIZANIDINE HCL 4MG TAB. | 15 | NDC:55111-0180-10 | $ 21.98 |
| 08/12/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | IBUPROFEN 800 MG TABLET | 60 | NDC:64380-0807-07 | $ 26.78 |
| 08/12/2024 | 1211 FOSTER AVE, BROOKLYN, NY, 11230 | Dispensing Fee | 1 | S9430 | $ 5.00 |

**TOTAL CHARGES TO DATE $ 3137.76**

253.     The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

254.     All fraudulent Diclofenac Sodium 3% Gel billed in connection with Liberty Mutual claimants traveled through the U.S. Mail.

### 3.     Cyclobenzaprine

255.     Cyclobenzaprine is a muscle relaxant typically prescribed as a 5mg or 10mg tablet, rather than the 7.5 mg strength tablet that Argyle filled prescriptions for.  For example, Argyle billed Liberty Mutual $144.21 for unnecessary Cyclobenzaprine 7.5 mg tablets pursuant to code 72888-0013-01 which is considerably more expensive than the 5mg and 10mg doses:

| **Drug** | **NDC** | **AWP** |
|---|---|---|
| Cyclobenzaprine (10 mg) | 16571-0783-10 | $1.64/tablet |
| Cyclobenzaprine (7.5 mg) | 72888-0013-01 | $4.81/tablet |

256.     NDC No. 72888-0013-01 is issued in proportions of 100 tablets at a time.

257.     The published AWP of a 100 tablet supply of Cyclobenzaprine sold under NDC No. 72888-0013-01 was approximately $480.72.

42

258.     Argyle could charge approximately $346.12 for a 90 tablet supply of Cyclobenzaprine (after application of the 20% reduction required under applicable New York law) under NDC No. 72888-0013-01.

259.     The WAC for Cyclobenzaprine sold under NDC No. 72888-0013-01 was approximately $98.00 per 100 tablets.

260.     Acquiring Cyclobenzaprine at or around the WAC meant that the Defendants realized a profit of over $334.63 each time that Argyle billed for 90 tablets of Cyclobenzaprine under NDC No. 72888-0013-01.

261.     The Defendants also exploited the AWP and WAC for Cyclobenzaprine, which was billed under NDC Nos. 29300-0413-05, 52817-0332-00, and 16571-0782-10.

262.     The Defendants billed Liberty Mutual for excessive fees in connection with Cyclobenzaprine 7.5 to fulfill its goal of defrauding Liberty Mutual.

263.     A true and accurate representation of an invoice to Liberty Mutual from Argyle for Liberty Mutual claimant I.R., claim number 056956130, showing the billing for Cyclobenzaprine 7.5mg is below:

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 06/11/2024 | see below* | Lidocaine Oin 5% QTY:250 | NDC 62332042450 | 1904.50 |
| 06/11/2024 | see below* | Cyclobenzapr 7.5MGTab QTY:30 | NDC72888001301 | 144.21 |
| 06/11/2024 | see below* | Dispensing Fee | S9430 | 5.00 |
| *1211 Foster Ave Brooklyn, NY 11230 | | | TOTAL CHARGES TO DATES | 2053.71 |

264.     The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

265.    All fraudulent Cyclobenzaprine billed in connection with Liberty Mutual claimants traveled through the U.S. Mail.

### 4.    Naproxen

266.    Naproxen Esomeprazole is a combination medication designed to negate some of the stomach irritation caused by Naproxen itself.  Naproxen Esomeprazole, commonly known as VIMOVO, is not recommended for initial treatment of acute pain because the absorption of Naproxen is delayed compared to absorption from other Naproxen containing products.  It is approved for treatment of osteoarthritis, rheumatoid arthritis and ankylosing spondylitis in adults. Naproxen is the only active ingredient to treat pain and inflammation.

267.    Naproxen as a standalone, is approved for musculoskeletal pain and inflammation, it is not recommended for long term use.

268.    The published AWP for  of a 60 unit supply of Naproxen Esomeprazole under 55111-0701-60 is approximately $2,680.78.  The practice of prescribing the combination of Naproxen and Esomeprazole clearly demonstrates Argyle's intent to defraud Liberty Mutual.

| Drug | NDC | AWP |
|---|---|---|
| Naproxen Esomeprazole | 55111-0701-60 | $44.68/tab |
| Naproxen (Aleve) | 00280-6050-01 | $0.12/tab |
| Esomeprazole | 67877-0571-90 | $8.83/tab |

269.    The Defendants could charge approximately $2,144.62 for a 60 unit supply (after application of the 20% reduction required under applicable New York law) under NDC 55111-0701-60.

270.    The WAC for Naproxen Esomeprazole NDC 55111-0701-60 is approximately $1,613.43.

271.    Acquiring Naproxen Esomeprazole at or around the WAC meant that the Defendants realized a profit of over $1,286.57 each time that Argyle billed for 60 units of Naproxen Esomeprazole under NDC No. 55111-0701-60.

272.    The Defendants also exploited the AWP for Naproxen by billing the NDC 50228-0433-05 and 68462-0179-05.

273.    A true and accurate representation of an Argyle bill to Liberty Mutual for claimant A.B., claim number 056917029, is below:



274.    The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

275.    All fraudulent Naproxen Esomeprazole and Naproxen billed in connection with Liberty Mutual claimants traveled through the U.S. Mail.

**5.    Baclofen**

276.    The Defendants also exploited the AWP and WAC for Baclofen, which Argyle billed under NDC Nos. 29300-0344-01, 59651-0395-99, 70756-0288-11.  Baclofen is recommended to be started at a dose of 5mg, and, if necessary, gradually increased.  Argyle filled prescriptions almost exclusively for 20mg to further defraud Liberty Mutual.

45

| Drug | NDC | AWP |
|------|-----|-----|
| Baclofen (20 mg) | 29300-0344-01 | $5.13/tablet |
| Baclofen (5 mg) | 72888-0009-01 | $1.24/tablet |

277.    For example, Argyle billed $153.90 for a 30 unit supply of Baclofen under NDC No. 29300-0344-01.

278.    The published AWP of a 100 unit supply of Baclofen sold under NDC No. 29300-0344-01 was approximately $513.03.

279.    Argyle could charge approximately $123.12 for a 30 unit supply of Baclofen (after application of the 20% reduction required under applicable New York law) under NDC No. 29300-0344-01.

280.    The WAC for Baclofen sold under NDC No. 29300-0344-01 is $10.50 per 100 units.

281.    Acquiring Baclofen at or around the WAC meant that the Defendants realized a profit of over $150.40 each time that Argyle billed for 30 units of Baclofen under NDC No. 29300-0344-01.

282.    A true and accurate representative of the billing by Argyle to Liberty Mutual for Liberty Mutual claimant G.H., claim number 054388953, showing the practice of billing for Baclofen 20mg is depicted below:

283.    The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

284.    All fraudulent Baclofen billed in connection with Liberty Mutual claimants traveled through the U.S. Mail.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

285.    The Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising and intending to devise, schemes to defraud and obtain money and property using false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) to execute, or attempt, such fraudulent schemes.

286.    Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

287.    Every automobile insurance claim detailed within this Complaint involved at least two uses of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the canceled payment instruments to the financial institution(s) from which the draft(s) were drawn.

A.    **ARGYLE ENTERPRISE**

288.    Bibi and Yuzefpolsky either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records and/or invoices/bills from Bibi and Yuzefpolsky to be mailed to Liberty Mutual (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

289.    Bibi and Yuzefpolsky caused Argyle to falsely certify that they were eligible to be reimbursed under New York's No-Fault Laws each time that Argyle mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Liberty Mutual.

290.    Bibi and Yuzefpolsky's participation in the operation and management of the Argyle enterprise, which included, among other things, (a) owning Argyle, (b) facilitating unlawful prescriptions between Argyle and prescribers, (c) dispensing medically unnecessary and ineffective drugs and medications to Argyle's patients, and (d) causing Argyle to submit false and fraudulent No-Fault benefit claims to Liberty Mutual, rendered Argyle completely ineligible for No-Faul reimbursement under New York law.

291.    As a result of the above-described conduct, Bibi and Yuzefpolsky purposely caused Argyle to make a misrepresentation every time that Argyle mailed (or was caused to mail) a document to Liberty Mutual claiming eligibility for No-Fault reimbursement.

292.    Moreover, because (a) Bibi and Yuzefpolsky engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of the Argyle enterprise, (b) Bibi and Yuzefpolsky caused Argyle to seek No-Fault reimbursement from Liberty Mutual (even though Argyle was not lawfully entitled to such reimbursement), and (c)

Argyle used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Bibi and Yuzefpolsky committed mail fraud.

293.    At all relevant times Bibi and Yuzefpolsky knew that Argyle used (including its employees, owner(s), contractors, and agents) a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Liberty Mutual would use (or be caused to use) the U.S. mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Argyle.

294.    Liberty Mutual estimates that the unlawful operation of the Argyle enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed as Exhibit 7 and incorporated herein as if outlined in its entirety.

**B.    ATLANTIC MEDICAL ENTERPRISE**

295.    Argyle, Bibi and Yuzefpolsky either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records and/or invoices/bills from Argyle, Bibi and Yuzefpolsky to be mailed to Liberty Mutual (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

296.    Bibi and Yuzefpolsky caused Argyle to falsely certify that they were eligible to be reimbursed under New York's No-Fault Laws each time that Atlantic Medical and/or Argyle mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Liberty Mutual.

297.    Argyle participated in the Atlantic Medical enterprise by fulfilling the unlawful prescriptions.

298.    Bibi and Yuzefpolsky's participation in the operation and management of the Atlantic Medical enterprise, which included, among other things, (a) owning Argyle, (b) facilitating unlawful prescriptions between Argyle and prescribers, (c) dispensing medically unnecessary and ineffective drugs and medications to Argyle's patients, and (d) causing Argyle to submit false and fraudulent No-Fault benefit claims to Liberty Mutual, rendered Argyle completely ineligible for No-Faul reimbursement under New York law.

299.    As a result of the above-described conduct, Bibi and Yuzefpolsky purposely caused Atlantic Medical and Argyle to make a misrepresentation every time that Atlantic Medical and Argyle mailed (or was caused to mail) a document to Liberty Mutual claiming eligibility for No-Fault reimbursement.

300.    Moreover, because (a) Bibi and Yuzefpolsky engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of the Atlantic Medical enterprise, (b) Bibi and Yuzefpolsky caused Argyle to seek No-Fault reimbursement from Liberty Mutual (even though Argyle was not lawfully entitled to such reimbursement), and (c) Atlantic Medical and Argyle used (or were caused to use) the U.S. Mail to seek reimbursement, it is clear that Bibi and Yuzefpolsky committed mail fraud.

301.    At all relevant times Bibi and Yuzefpolsky knew that Argyle used (including its employees, owner(s), contractors, and agents) a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Liberty Mutual would use (or be caused to use) the U.S. mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Atlantic Medical and Argyle.

302.    Liberty Mutual estimates that the unlawful operation of the Atlantic Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings

made in furtherance of this scheme is annexed as Exhibit 7 and incorporated herein as if outlined in its entirety.

## VII.  SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY LIBERTY MUTUAL

### A.  ARGYLE ENTERPRISE

303.    At all relevant times during the operation of the Argyle enterprise, Bibi and Yuzefpolsky purposely caused Argyle to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws to induce Liberty Mutual to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Liberty Mutual claimants who were caused to be customers of Argyle.

304.    At all relevant times, Bibi and Yuzefpolsky, directly participated in the operation and management of Argyle by directing unlawful referrals for prescriptions.

305.    Because Bibi and Yuzefpolsky were responsible for causing Argyle's (a) billing Liberty Mutual for drugs that were not medically necessary and were completely unjustified to treat the Liberty Mutual claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Liberty Mutual for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by Argyle, then Argyle were caused to falsely claim eligibility for No-Fault reimbursement each and every time that Argyle sought No-Fault reimbursement from Liberty Mutual.

306.    As alleged above, Bibi and Yuzefpolsky caused Argyle to create and submit to Liberty Mutual No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

307.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

308.    Many of Argyle, Bibi and Yuzefpolsky's, false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Liberty Mutual by Argyle, Bibi and Yuzefpolsky, and upon which Liberty Mutual relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

309.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accordance with all applicable New York state licensing requirements.

310.    Thus, every time that Bibi and Yuzefpolsky caused Argyle to submit No-Fault reimbursement demands to Liberty Mutual, Bibi and Yuzefpolsky necessarily certified that Argyle was eligible to be reimbursed under New York's No-Fault laws.

311.    The full extent of Bibi and Yuzefpolsky's fraudulent and unlawful acts relative to their participation in the Argyle enterprise was not known to Liberty Mutual until shortly before it commenced this action.

### B.    ATLANTIC MEDICAL ENTERPRISE

312.    At all relevant times during the operation of the Atlantic Medical Enterprise, Argyle, Bibi and Yuzefpolsky purposely caused Argyle to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws to induce Liberty Mutual to promptly pay charges

related to prescription drugs and other pharmacy services purportedly provided to Liberty Mutual claimants who were caused to be customers of Argyle.

313.    At all relevant times, Argyle, Bibi and Yuzefpolsky directly participated in the operation and management of Atlantic Medical by directing unlawful referrals for prescriptions.

314.    Because Bibi and Yuzefpolsky were responsible for causing Argyle's (a) billing Liberty Mutual for drugs that were not medically necessary and were completely unjustified to treat the Liberty Mutual claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Liberty Mutual for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by Argyle, then Argyle were caused to falsely claim eligibility for No-Fault reimbursement each and every time that Argyle sought No-Fault reimbursement from Liberty Mutual.

315.    As alleged above, Bibi and Yuzefpolsky caused Argyle to create and submit to Liberty Mutual No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

316.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

317.    Many of Argyle, Bibi, and Yuzefpolsky's, false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Liberty Mutual by Argyle, Bibi and

Yuzefpolsky, and upon which Liberty Mutual relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

318.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accordance with all applicable New York state licensing requirements.

319.    Thus, every time that Bibi and Yuzefpolsky caused Argyle to submit No-Fault reimbursement demands to Liberty Mutual, Bibi and Yuzefpolsky necessarily certified that Argyle was eligible to be reimbursed under New York's No-Fault laws.

320.    The full extent of Bibi and Yuzefpolsky's fraudulent and unlawful acts relative to their participation in the Atlantic Medical enterprise was not known to Liberty Mutual until shortly before it commenced this action.

## VIII.    LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE

321.    Each claim submitted to Liberty Mutual by Argyle was verified according to Insurance Law § 403.

322.    Bibi and Yuzefpolsky, as owners of Argyle, were responsible for the proper conduct of Argyle in accordance with New York law.

323.    To induce Liberty Mutual to promptly pay Argyle's patient invoices, the Defendants submitted (or caused to be submitted) to Liberty Mutual NF-3 bills certifying that Argyle was eligible to be reimbursed under New York's No-Fault Laws.

324.    Further, to induce Liberty Mutual to promptly pay the fraudulent charges for prescription drug and other pharmacy services purportedly provided to Liberty Mutual claimants, the Defendants hired attorneys to pursue collection of the fraudulent charges from Liberty Mutual.

These attorneys routinely file time-consuming and expensive lawsuits and arbitration matters against Liberty Mutual.

325.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to Liberty Mutual by (or on behalf of) the Defendants in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Liberty Mutual to justifiably rely on them.

326.    The Defendants concealed from Liberty Mutual the truth regarding reimbursement eligibility under New York law.

327.    In reasonable reliance on these misrepresentations, Liberty Mutual paid money to the Defendants to its detriment.

328.    Liberty Mutual would not have paid these monies had the Defendants provided true and accurate information about the Defendants' reimbursement eligibility under New York law, including (a) the Defendants' No-Fault reimbursement eligibility under N.Y. Ins. Law § 5101, et seq., and (b) the fact and necessity of the services purportedly provided to those Liberty Mutual claimants and customers of the Defendants eligible for insurance coverage under an automobile insurance policy issued by Liberty Mutual.

329.    As a result, Liberty Mutual was caused to pay Argyle over $748,350.27 in reasonable reliance on Argyle's false No-Fault claim reimbursement documentation and the Defendants' false representations regarding Argyle's eligibility for reimbursement under New York's No-Fault Laws.

## IX.    DAMAGES

330.    The Defendants' pattern of fraudulent conduct injured Liberty Mutual in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Liberty Mutual to calculate damages with specificity at this stage in the litigation (whereas Liberty Mutual's damages continue to accrue), Liberty Mutual's injury includes, but is not limited to, compensatory damages for payments in connection with first-party claims in excess of $748,350.27, the exact amount to be determined at trial, including payments made to Argyle in connection with first-party claims in excess of $748,350.27, the exact amount to be determined at trial.  The chart annexed at Exhibit 8, and incorporated herein as if set forth in its entirety, identifies Liberty Mutual's payments to Argyle in connection with first-party ("No-Fault") claims determined to be fraudulent as of the filing of this Complaint.

causes of action

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ARGYLE PHARMACY INC ENTERPRISE**
**(Against Bibi and Yuzefpolsky)**

331.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 330 as if set forth fully herein.

332.    In furtherance of their operation and management of Argyle, Defendants Bibi and Yuzefpolsky (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Liberty Mutual insurance claims in furtherance of this scheme to defraud.

333.    The Count I Defendants employed two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

334.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Liberty Mutual through the U.S. Mail.

335.    Policies of insurance were delivered to two or more Liberty Mutual claimants through the U.S. Mail.

336.    Payments made by Liberty Mutual to the Count I Defendants were delivered through the U.S. Mail.

337.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Liberty Mutual related to Pain Products and other drugs dispensed and delivered by the Count I Defendants to collect payment from Liberty Mutual under the Personal Injury Protection benefits portion of the Liberty Mutual policies and applicable New York No-Fault laws.

338.    When the Count I Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Liberty Mutual seeking No-Fault reimbursement, the Count I Defendants materially misrepresented the No-Fault reimbursement eligibility under New York law.

339.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Liberty Mutual, by its agents and employees, issued drafts to the Count I Defendants for the benefit of one or more of the Count I Defendants that would not otherwise have been paid.

340.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing

legitimate on their face, also prevented Liberty Mutual from discovering this scheme for a significant period, thus enabling the Count I Defendants to continue this scheme without being detected.

341.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

342.    The activities alleged in this case had the direct effect of causing funds to be transferred from Liberty Mutual to Atlantic Medical for the benefit of the Count I Defendants.

343.    Liberty Mutual is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Liberty Mutual's overall financial well-being and adversely affect insurance rates.

344.    Argyle constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

345.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

346.    Liberty Mutual is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count I Defendants' conduct.

347.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

348.    Because of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ARGYLE PHARMACY INC ENTERPRISE**
**(Against Bibi and Yuzefpolsky)**

349.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 330 as if fully set forth herein.

350.    Through their participation in the operation and management of Argyle, Defendants, Bibi, and Yuzelpolsky (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

351.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of Argyle through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Liberty Mutual.

352.    The purpose of the conspiracy was to obtain No-Fault payments from Liberty Mutual on behalf of Argyle, even though Argyle, as a result of the Count II Defendants' unlawful conduct, were not eligible to collect such No-Fault payments.

353.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

354.    Liberty Mutual has been injured in its business and property because of this conspiratorial conduct whereas Liberty Mutual has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

355.    Because of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Liberty Mutual, and Liberty Mutual is entitled to recover from each of the

defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Argyle, Bibi and Yuzefpolsky)**

356.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 330 as if set forth fully herein.

357.    In furtherance of their operation and management of Atlantic Medical, Defendants, Argyle, Bibi and Yuzefpolsky (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Liberty Mutual insurance claims in furtherance of this scheme to defraud.

358.    The Count III Defendants employed two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

359.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Liberty Mutual through the U.S. Mail.

360.    Policies of insurance were delivered to two or more Liberty Mutual claimants through the U.S. Mail.

361.    Payments made by Liberty Mutual to the Count III Defendants were delivered through the U.S. Mail.

362.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Liberty Mutual related to Pain Products and other drugs dispensed and delivered by the Count III Defendants to collect payment from Liberty Mutual under the Personal Injury Protection benefits portion of the Liberty Mutual policies and applicable New York No-Fault laws.

363.    When the Count III Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Liberty Mutual seeking No-Fault reimbursement, the Count III Defendants materially misrepresented the No-Fault reimbursement eligibility under New York law.

364.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Liberty Mutual, by its agents and employees, issued drafts to the Count III Defendants for the benefit of one or more of the Count III Defendants that would not otherwise have been paid.

365.    The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Liberty Mutual from discovering this scheme for a significant period, thus enabling the Count III Defendants to continue this scheme without being detected.

366.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

367.    The activities alleged in this case had the direct effect of causing funds to be transferred from Liberty Mutual to Argyle for the benefit of the Count III Defendants.

368.    Liberty Mutual is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Liberty Mutual's overall financial well-being and adversely affect insurance rates.

369.    Atlantic Medical constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

370.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

371.    Liberty Mutual is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count III Defendants' conduct.

372.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

373.    Because of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Argyle, Bibi and Yuzefpolsky)**

374.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 330 as if fully set forth herein.

375.    Through their participation in the operation and management of Atlantic Medical, Defendants, Argyle, Bibi, and Yuzefpolsky (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

376.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of Atlantic Medical through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Liberty Mutual.

377.    The purpose of the conspiracy was to obtain No-Fault payments from Liberty Mutual on behalf of Argyle, even though Argyle, as a result of the Count IV Defendants' unlawful conduct, were not eligible to collect such No-Fault payments.

378.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

379.    Liberty Mutual has been injured in its business and property because of this conspiratorial conduct whereas Liberty Mutual has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

380.    Because of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Liberty Mutual, and Liberty Mutual is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### COMMON LAW FRAUD
### (Against All Defendants)

381.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 330 as if fully set forth herein.

382.   The Defendants schemed to defraud Liberty Mutual by, among other things, (a) billing Liberty Mutual for drugs that were not medically necessary and were completely unjustified to treat the Liberty Mutual claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Liberty Mutual for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by Argyle.

383.   The Defendants' scheme to defraud Liberty Mutual was dependent upon a succession of material misrepresentations of fact related to Argyle's eligibility for and entitlement to No-Fault reimbursement under New York law.

384.   The misrepresentations of fact by the Defendants included, but were not limited to, material misrepresentations of fact made in Argyle's NF-3 forms, prescription forms, patient treatment records, delivery receipts, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and/or payment requests.

385.   The Defendants' representations were false or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

386.   The misrepresentations were intentionally made by the Defendants in furtherance of their scheme to defraud Liberty Mutual by submitting claims on behalf of Argyle. demanding payment of No-Fault insurance benefits.

387.   The Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Liberty Mutual claimants were false, and were made to

induce Liberty Mutual to make payments for claims that were not legitimate or lawfully compensable.

388.    Liberty Mutual reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning Argyle's eligibility to receive No-Fault reimbursement in paying numerous bills for prescription drugs and other pharmacy expenses according to New York's No-Fault insurance laws.

389.    Liberty Mutual's damages include, but are not necessarily limited to, Argyle totaling more than $748,350.27—for prescription drug and other pharmacy expenses and services rendered to Liberty Mutual claimants, even though Argyle was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

390.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 330 as if fully set forth herein.

391.    As alleged herein, the Defendants, through various means, conspired to induce Liberty Mutual to make numerous and substantial payments to Argyle in connection with claims made under New York's No-Fault Laws.

392.    When Liberty Mutual paid Argyle, Liberty Mutual reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made (or were caused to make) concerning Argyle's reimbursement eligibility under New York's No-Fault Laws.

393.    Every No-Fault reimbursement payment that Liberty Mutual was caused to make to (or for the benefit of) Argyle during this scheme constitutes a benefit that the Defendants aggressively caused Argyle to seek and voluntarily accept.

394.    Throughout their scheme, the Defendants caused Argyle to wrongfully obtain a multitude of payments from Liberty Mutual—totaling over $748,350.27—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

395.    Under New York law, the Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Liberty Mutual in connection with claims submitted by (or on behalf of) the Defendants because Argyle (a) billed Liberty Mutual for drugs that were not medically necessary and were completely unjustified to treat the Liberty Mutual claimants' purported injuries, (b) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charged Liberty Mutual for drugs at grossly excessive rates, (d) dispensed drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintained unlawful relationships with prescribers and induced them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by Argyle.

396.    As a direct and proximate result of this unlawful conduct relating to the billing for fraudulent, unnecessary, and ineffective drugs with respect to Liberty Mutual claimants, at no point was Argyle ever eligible for reimbursement under New York's No-Fault Laws.

397.    Throughout this scheme, the Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Liberty Mutual was wrongfully induced to make to Argyle.

398.    Retention of those benefits by any of the Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT VII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Argyle)**

399.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 330 as if set forth fully herein.

400.    To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

401.    In view of its (a) billing Liberty Mutual for drugs that were not medically necessary and were completely unjustified as a means of treating the Liberty Mutual claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Liberty Mutual for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by Argyle were, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

402.    Argyle continues to submit assigned No-Fault claims to Liberty Mutual demanding payment, and other assigned No-Fault claims remain pending with Liberty Mutual.

403.    Argyle continues to challenge Liberty Mutual's prior claim denials.

67

404.    Argyle continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Liberty Mutual seeking payment of No-Fault benefits allegedly due and owing.

405.    A justifiable controversy exists between Liberty Mutual and Argyle because Argyle rejects Liberty Mutual's ability to deny such claims.

406.    Liberty Mutual has no adequate remedy at law.

407.    Argyle also will continue to bill Liberty Mutual for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Liberty Mutual has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Argyle.

408.    Accordingly, Liberty Mutual requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that (a) that Argyle. has no standing to seek, collect, or retain any payments made by Liberty Mutual in connection with assigned No-Fault benefits, and (b) that Liberty Mutual has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Liberty Mutual by, or on behalf of, Argyle.

## X.    **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs, LM General Insurance Company, American States Insurance Company, Liberty Mutual Personal Insurance Company, and LM Insurance Corporation (collectively, "Liberty Mutual"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ARGYLE PHARMACY INC ENTERPRISE**
**(Against Bibi and Yuzefpolsky)**

(a) AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b) AWARD Liberty Mutual's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ARGYLE PHARMACY INC ENTERPRISE
### (Against Bibi and Yuzefpolsky)

(a) AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b) AWARD Liberty Mutual's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE
### (Against Argyle, Bibi and Yuzefpolsky)

(a) AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b) AWARD Liberty Mutual's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**<u>COUNT IV</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ATLANTIC MEDICAL& DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Argyle, Bibi and Yuzefpolsky)**

(a)  AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b)  AWARD Liberty Mutual's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c)  GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

**<u>COUNT V</u>**
**COMMON LAW FRAUD**
**(Against All Defendants)**

(a)  AWARD Liberty Mutual's actual damages in an amount to be determined at trial;

(b)  AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;

(c)  AWARD Liberty Mutual its costs in defending No-Fault collection suits filed by Argyle seeking payment of false and fraudulent invoices; and

(d)  GRANT any other relief this Court deems just.

**<u>COUNT VI</u>**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

(a)  AWARD Liberty Mutual's actual and consequential damages to be determined at trial; and

(b)  GRANT any other relief this Court deems just.

## COUNT VII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Argyle)

(a) DECLARE that Argyle Pharmacy Inc, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering Argyle completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that Argyle's activities are unlawful;

(c) DECLARE that Liberty Mutual has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Argyle; and

(d) GRANT all other relief this Court deems just and appropriate.


## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.


[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.,

*/s/ Shauna L. Sullivan*

_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
350 Granite St, Ste 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*LM General Insurance Company,*
*American States Insurance Company,*
*Wausau Underwriters Insurance Company,*
*Liberty Mutual Fire Insurance Company,*
*Liberty Mutual Personal Insurance Company, and*
*LM Insurance Corporation*

Dated: March 25, 2025